IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| CHRISTOPHER LEON OLMSTED, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Case No. 03-1735-KI |
| | ) | |
| vs. | ) | OPINION |
| | ) | |
| B. COONEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Christopher Leon Olmsted
SID #10633766
777 Stanton Blvd.
Ontario, Oregon 97914-0595

    Pro Se Plaintiff

Hardy Myers
Attorney General
Kathryn A. Cottrell
Assistant Attorney General
Department of Justice
1162 Court Street N. E.
Salem, Oregon 97301-4096

    Attorneys for Defendants

Page 1 - OPINION

KING, Judge:

Plaintiff Christopher Olmstead, an inmate currently incarcerated at Two Rivers Correctional Institute in Umatilla, Oregon, alleges that several corrections officers violated his constitutional rights when he was incarcerated at Oregon State Penitentiary ("OSP"). Before the court is Defendants' Motion for Summary Judgment (#39). For the reasons below, I grant summary judgment against all claims.

**FACTS**

Olmstead was incarcerated at OSP during all times relevant to this action. On July 17, 2003, Olmstead was issued a misconduct report ("DR"), submitted by Sergeant B. Kelly, charging him with violating the following rules: Contraband II, Assault I, Disobedience of an Order I, and Unauthorized Organization I. The DR was also signed by Lieutenant D. Harlow, the reviewing supervisor and officer in charge.

A disciplinary hearing was held on July 22, 2003. When asked, Olmstead admitted he violated the rule prohibiting Contraband II and denied the remaining allegations. In the hearing, Hearings Officer Cooney considered Olmstead's testimony, his written statement, and the statements of confidential informants. Olmstead was denied the opportunity to call witnesses on his behalf. Cooney found Olmstead guilty of Assault I, Unauthorized Organization I, and Contraband II, but not guilty of Disobedience of an Order I. She recommended a sanction of 120 days disciplinary segregation, $50 fine, 28 days loss of privileges upon release from segregation, confiscation of the contraband, and retraction of 126.71 earned time credits.

Robert Lampert, Acting Superintendent, amended the order with an upward deviation of the segregation sanction by 50%, thus resulting in 180 days disciplinary segregation. Olmstead

sought administrative review of Lampert's final order on August 12, 2003. Inspections Division Administrator Rebecca Prinslow considered Olmstead's case and issued a response finding there was substantial compliance with the rule, the findings were based on a preponderance of the evidence, and the sanction imposed was in accordance with the rule. Olmstead also wrote OSP's superintendent, B. Belleque, to request an administrative review. Belleque refused involvement in the misconduct hearing or the resulting sanctions.

On the evening of August 14, 2003, a disturbance occurred in the Disciplinary Segregation Unit ("DSU") on the high side of the 2nd tier. A group of inmates were threatening another inmate, Inmate A, in an attempt to force him off the tier. A group of inmates began to pressure Inmate B, A's cell partner, to assault him. DSU staff heard the threats, removed Inmate A from the tier, and then informed the other inmates they would be moved as well. During the cell moves, a large amount of water began pouring off of the second tier and inmates began yelling, rattling their doors, and throwing trash. Water to the affected cells was shut off. Sergeant Harris was in charge of DSU at the time of the event. A decontamination crew was dispatched to DSU that night, but was unable to finish cleaning.

The following morning, August 15, Lieutenant Long took over the DSU. Long decided to postpone clean-up until the usual operations in the remainder of DSU could be accomplished. The affected area of DSU was shut down until the unsanitary conditions on the tier could be cleaned. The decontamination crew arrived at 11:30 a.m. and completed cleaning by a little after 1:00 p.m.

Olmstead alleges his constitutional rights under the 14th Amendment were violated by corrections officers Cooney, Belleque, Lampert, Harlow, Kelly, Manu, and Prinslow with regard

to the hearing on July 22, 2003. Olmstead also alleges his constitutional rights under the 8th Amendment were violated by corrections officers Harris and Long with regard to the incident in DSU on August 14 - 15, 2003. I previously denied a motion for summary judgment by the defendants for failure to exhaust administrative remedies.

**LEGAL STANDARDS**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Robi v. Reed, 173 F.3d 736, 739 (9th Cir.), cert. denied, 528 U.S. 375 (1999).

**DISCUSSION**

I.   Procedural Due Process

Olmstead alleges that defendants violated his due process rights because: (1) he was unable to call witnesses in his defense during the misconduct hearing; (2) Officer Cooney, the hearings officer, refused to verify the reliability of confidential informant statements she relied on; (3) Officer Cooney did not act as an impartial fact finder; and (4) the misconduct report relied on contained false statements.

Procedural due process requirements only apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. Board of

Regents v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701 (1972). Liberty interests are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293 (1995).

Due process demands are reduced accordingly once society has validly convicted an individual of a crime and therefore established its right to punish. Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 118 S. Ct. 1244 (1998) (O'Connor, J., concurring in part and concurring in the judgment). However, even with this due process reduction, it is clearly established that a prison disciplinary hearing must still base its decisions on some evidence in the record. *See* Superintendent Mass. Cor. Inst., Walpole v. Hill, 472 U.S. 445, 105 S. Ct. 2768 (1985) (the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board).

Defendants allege they are entitled to qualified immunity. Courts use a three-step test to determine if a defendant is entitled to qualified immunity on a federal constitutional claim. First, the court determines if the facts alleged, viewed in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a constitutional right. Brown v. Li, 308 F.3d 939, 946-47 (9th Cir. 2002), cert. denied, 538 U.S. 908 (2003) (relying on Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 1251 (2001)). If the facts show a constitutional violation, the court decides if the constitutional right at stake was clearly established at the time of the alleged violation. If so, the final inquiry is whether an objectively reasonable government actor would have known that his conduct violated the plaintiff's constitutional right. Id. at 947. Plaintiff has the burden of proving that a right is clearly established. Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002).

Olmstead alleges Officer Cooney violated his due process rights at the hearing by not calling the witnesses he requested. An inmate may request that the hearings officer schedule witnesses to present testimony at the hearing. The request must be submitted in writing in advance of the hearing and include a list of the person(s) the inmate wishes to call and the questions to be posed to each person. OAR 291-105-0028(9)(b). Also, the hearings officer may exclude specific witnesses upon finding the testimony, taken in the light most favorable to the inmate, together with the reasonable inferences to be drawn from the testimony, would not constitute a defense to the violation. OAR 291-105-0028(9)(e). Officer Cooney states in her affidavit that Olmstead did not provide questions to be asked of the witnesses he wished to call. Therefore, her denial of those witnesses was proper. Further, Officer Cooney states that the testimony he requested, even in favor of him, would not substantially lessen the severity of the charges or provide a defense capable of offsetting the other evidence in the case. Officer Cooney was able to exercise her discretion under OAR 291-105-0028(9)(b) & (e) to exclude the witnesses.

Olmstead alleges Officer Cooney relied on statements of confidential informants and did not verify those statements. In order for a hearings officer to rely on the testimony of a confidential informant, information must be submitted to the hearings officer from which the hearings officer can find that the informant is a person who can be believed or that the information provided in the disciplinary action at issue is truthful. OAR 291-105-0028(9)(k)(B). Officer Cooney states that she found the confidential informants could be believed and the information provided was truthful. There is no constitutional obligation that she go beyond these findings and *verify* the information. In his statement of disputed facts, Olmstead alleges he was

not given the statements used in his hearing. When confidential informant testimony is submitted to the hearings officer, the identity of the informant and the verbatim statement of the informant shall be submitted to the hearings officer in writing, but shall remain confidential. OAR 291-105-0028(9)(k)(A). Officer Cooney followed proper procedure in not releasing the statements to Olmstead because they came from confidential informants.

Olmstead alleges Officer Cooney did not act as an impartial factfinder. A hearings officer "shall not have been a witness to the event, have personal knowledge of any material, disputed fact relating to the case or have participated in the case as a charging or investigating officer." OAR 291-105-0026(3). Officer Cooney states in her affidavit that she was not a witness to the event, she had no personal knowledge of any material, disputed fact relating to the case, and she did not participate in the case as a charging or investigating officer. Olmstead does not present any evidence that Officer Cooney was a witness to the event or had personal knowledge of material, disputed facts. Officer Cooney was an impartial factfinder in the hearing.

Olmstead also alleges his due process rights were violated because false statements were put in the misconduct report filed against him. He has no information or evidence that this is true or even raising a factual issue, therefore, it can not be found to be a constitutional violation.

Finally, Olmstead alleges defendants Cooney, Harlow, Manu, and Kelly worked together to ensure that Olmstead's hearing resulted in extensive time in confinement, monetary loss, and retraction of good time credits as punishment for not providing information at the interview conducted on July 13, 2003. Olmstead was found guilty at the hearing of Assault I, Unauthorized Organization I, and Contraband II. In his complaint, Olmstead states that the misconduct report he received listed the potential sanctions for the violations as follows:

Contraband II, seven to twenty–one days in the disciplinary segregation unit (DSU); Assault I, mandatory 120 days in DSU; and Unauthorized Organization I, mandatory 120 days in DSU. Officer Cooney states that the sanction she gave Olmstead was based on his history, ten major rule violations in the past four years, and the current charges. Acting Superintendent Lampert amended the sanctions and ordered 180 days segregation. Under OAR 291-105-0072, the hearings officer or functional unit manager may deviate, either upward or downward on major violations in formal hearings, but under no circumstance may the deviation exceed fifty percent of the segregation sanction. Also, all deviations must be supported by substantial written reasons. Acting Superintendent Lampert ordered the additional segregation because the misconduct was part of an organized operation and the timing and location of the assault threatened security. Both of these reasons are in the list of aggravating factors that may be considered in determining whether substantial reasons for a deviation exist. OAR 291-105-0072(5)(b). The sanctions Olmstead received did not violate his due process rights.

    I also note Olmstead received the following due process protections: (1) he received a copy of the misconduct report; (2) he received a copy of the notice of hearing and notice of inmate rights; (3) he received a copy of the rules of prohibited conduct; (4) he was able to attend the hearing; (5) he was able to testify on his own behalf; (6) he received a written ruling; and (7) he was able to seek administrative review of the final order.

    I conclude Olmstead has failed to raise a factual issue that his due process rights were violated. I grant summary judgment against Olmstead's due process claim.

II.     Cruel and Unusual Punishment

Olmstead alleges defendants submitted him to cruel and unusual punishment in violation of the Eighth Amendment on August 14, 2003, when the segregation unit was flooded with toilet water and raw sewage, and was not cleaned up until the following day. The initial flooding occurred at approximately 9:45 p.m. on August 14 and was cleaned up by 1:00 p.m. on August 15. Olmstead alleges this was cruel and unusual punishment because he was forced to remain in a sewage flooded cell and because the water was turned off and not made useable to him during the time the cell was flooded.

The treatment a prisoner receives in prison and the conditions of his confinement are subject to scrutiny under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 31, 113 S. Ct. 2475 (1993). An Eighth Amendment claim must satisfy both an objective and subjective inquiry. Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000). The objective inquiry requires a showing that the inmate has been deprived of the minimal civilized measure of life's necessities. The subjective inquiry requires a showing that correctional officials acted with deliberate indifference. Id. at 1133.

Olmstead alleges he was made to live in a sewage flooded cell as a form of punishment for the actions of other inmates that night. He claims Officer Harris instructed the decontamination crew not to clean the area of the tier where his cell was located. There is no evidence of how Olmstead has knowledge of this.

Olmstead also alleges Officer Harris told the inmates on the tier that they would have to live in the mess that they created as a punishment for causing it. Olmstead alleged Officer Long stated he could leave the inmates in the mess for a week if he chose to and that Long made it

clear to the inmates that having no water to drink, perform personal hygiene with, or to flush the toilet with was a punishment that he could inflict as long as he wished, whenever he chose to. Even if all of these statements are true, they do not rise to the level of a constitutional violation. Keen v. Hall, 83 F.3d, 1083 (9th Cir. 1996), *amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (verbal harassment in the form of "disrespectful and assaultive comments" does not violate the Eighth Amendment when such comments only deny an inmate peace of mind).

Olmstead alleges Officer Long waited until after noon to begin the clean up of the sewage flooded areas when he could have begun as early as 8:00 a.m., when his shift began. Long states in his affidavit that twenty-four inmates occupied the affected area in the DSU at the time, while the remainder of the DSU held another ninety inmates. Long made the decision to postpone clean up of the area until after the usual operations of the DSU had been accomplished, such as wellness checks by nurses, inmates being rotated in and out of their cells for required exercise periods, and serving meals to inmates. All of these activities require security staff member supervision. The decontamination crew, which is comprised of inmates, requires security staff member supervision as well. Therefore, the clean up could only occur when security staff were available to supervise. Officer Long states that this was the best possible solution, because shutting down activities for the remaining ninety DSU inmates may have created a situation in which the inmates would become disruptive in protest. Olmstead has not raised a factual issue that defendants acted with deliberate indifference.

The flood occurred at approximately 9:45 p.m. on August 14, 2003, and was cleaned up by approximately 1:00 p.m. the following day. Olmstead alleges his exposure to sewage during this time constitutes cruel and unusual punishment. He also alleges the water was shut off at

approximately 10:00 p.m. and was not turned back on until the flood was cleaned up the following day. Olmstead cites a number of cases relating to this topic, but they are distinguishable. He cites Martino v. Carey, 503 F.Supp. 984 (D. Or. 1983), as stating that the sanitary disposal of bodily wastes, so that the waste does not contaminate the cells, is constitutionally required. The case found a constitutional violation because the cells in the Umatilla County Jail at the time did not have toilets that worked, thus the toilets were continually flooding the cells with sewage. Olmstead also cites LeReau v. MacDougall, 473 F.2d 974 (2nd Cir. 1972), which held that causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted. In LeReau, the only toilet within the cell was a hole in the floor that was covered by a grate. Both of these cases, and other similar ones cited by Olmstead, are significantly different then the current case. The courts found constitutional violations when there were not functioning toilets in the cells, causing the inmates to constantly be exposed to sewage. Here, the toilets are functioning and Olmstead was only exposed to sewage for approximately sixteen hours while the officers worked to get the area cleaned up. Part of this time was at night when the inmates were sleeping. The Supreme Court held in Hutto v. Finney, 437 U.S. 678, 98 s. Ct. 2565 (1978), that conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel if lasting for weeks or months. Although Olmstead's experience would have certainly been unpleasant, it does not rise to the level of a constitutional deprivation of the minimal civilized measures of life's necessities.

     I grant summary judgment against Olmstead's Eighth Amendment cruel and unusual punishment claim. Being forced to remain in a cell flooded with raw sewage for approximately sixteen hours does not rise to the level of a constitutional violation.

## CONCLUSION

Defendants' Motion for Summary Judgment (#39) is granted. All pending motions to compel are moot.[1] This action is dismissed with prejudice.

Dated this <u>    25th        </u> day of July, 2005.

                                              <u>  /s/ Garr M. King             </u>
                                              Garr M. King
                                              United States District Judge

---

[1] I reviewed the Motion to Compel's Exhibit #9 and find that the requested documents would not change my analysis.